**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LUCY HICKS,

        Plaintiff,

    v.                                  Case No. C-1-04-061

NOVARTIS PHARMACEUTICALS
CORPORATION,

        Defendant.

## <u>ORDER</u>

    This matter is before the Court upon defendant's motion for summary judgment (doc. 30),

plaintiff's opposing memorandum (doc. 34), and defendant's reply (doc. 36).  Plaintiff requests

oral argument on the motion.

## I. Introduction

    Plaintiff Lucy Hicks brings this action against her former employer, Novartis

Pharmaceuticals Corporation. Plaintiff brings claims for age discrimination under the Age

Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, et seq. and Ohio Revised Code Ch.

4112 [Counts I, II]; gender discrimination in violation of Title VII of the Civil Rights Act of

1964, as amended, and Ohio Revised Code Ch. 4112 [Counts III, IV]; disability discrimination in

violation of the American with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. and Ohio

Revised Code § 4112.02 [Counts V, VI]; retaliation for exercising her rights under the Family and

Medical Leave Act, 29 U.S.C. § 2601, et seq. [Count VII]; and breach of Ohio public policy

1

[Count VIII].

## II. Allegations of the complaint

Plaintiff makes the following allegations in the complaint: Plaintiff was born on April 28, 1953.  She began her employment with defendant on or about March 15, 1989.  She was most recently employed as a Senior Sales Consultant.  At all times during her employment, she was a loyal, hard-working, and dedicated employee.  She consistently received promotions, merit raises, and awards.

In April 2000, plaintiff was out of the office for approximately five weeks for surgery on her hand.  The leave was protected by the FMLA.  She was pushed to return to work in time to launch a prescription drug called Exelon.  She scheduled her second hand surgery against her doctor's wishes so that she would be present for the launch of Exelon.  In addition, plaintiff was diagnosed with mononucleosis in October 2000, then diabetes and "gamma globulen deficient," and vertigo in March 2001.

Plaintiff was on a medical leave beginning October 2001, and she stayed on a part-time schedule through January 2002 due to a torn Achilles tendon.  The leave was protected by the FMLA.  Plaintiff returned to work on a full-time basis in the beginning of February 2002.

Plaintiff's manager, Janeen McCormick, rated plaintiff's performance as satisfactory in her year-end performance evaluation in February 2002.  Following plaintiff's medical leave, McCormick's attitude toward her began to change.  McCormick stopped being supportive of plaintiff.  She told plaintiff that she needed to get her call averages up without taking into account that plaintiff's averages were down due to her being on medical leave through the end of January 2002.  Plaintiff explained to McCormick that the position of Senior Sales Consultant required her

2

to complete much of her paperwork outside of her work hours.  Plaintiff explained that she was doing the best she could to accomplish all of her work tasks, but her diabetes required her to rest and she could not work late into the night.  McCormick made no allowances for plaintiff's medical condition.

McCormick put plaintiff on a Coaching Plan in April 2002, stating that plaintiff was not meeting expectations.  McCormick said that plaintiff was failing to call upon physicians who prescribed Exelon, even though plaintiff was averaging 11 calls a day when the district expectation was 10.  Defendant stated that plaintiff was failing to use funds allocated to her for relationship management, but plaintiff was only allowed to use those funds for the top 25 prescribing doctors, many of whom would not do outside events or lunches, thereby making it impossible for plaintiff to spend all of her funds.

McCormick also started doing "ride alongs" with plaintiff.  During one ride along, McCormick exhibited unprofessional behavior by rolling her eyes, standing with her arms crossed, and giving the impression that she was not interested in being at the facility or supporting plaintiff's visit to the facility.  A registered nurse at the facility wrote a letter to defendant's sales department stating that, "Ms. McCormick will not be welcome in our clinical area again if her arrogant attitude continues."

McCormick recommended in late January 2003 that plaintiff be terminated for allegedly not performing her job as a Senior Sales Consultant.  On February 11, 2003, defendant enforced this recommendation by terminating plaintiff's employment.  At the time of her termination, her fellow employees were all either younger and/or had less experience.  Plaintiff was treated differently than similarly-situated younger and/or male and/or non-disabled employees, and

defendant engaged in a pattern and practice of discrimination.

### III. Motion for summary judgment

Defendant moves for summary judgment on each of plaintiff's claims. Defendant contends that all claims must be dismissed because plaintiff was terminated for poor performance and not for any reason related to her age, gender, alleged disability, or medical leave. Defendant alleges that despite efforts to correct problems with plaintiff's performance that first surfaced in 2001, plaintiff's performance problems continued to the point where defendant decided to terminate plaintiff for unsatisfactory performance. Defendant specifically claims that plaintiff performed poorly by (1) being habitually tardy in turning in assignments and requested documents to her manager; (2) failing to create an adequate territory management plan, as directed by her manager; (3) failing to follow her manager's directions regarding calling on Tier 1 and Tier 2 physicians every two weeks and Tier 3 physicians every four weeks; (4) failing to expand her physician database; (5) failing to call upon Company-identified top-prescribing physicians; (6) failing to engage in adequate pre-call planning; (7) failing to utilize post-call notes; (8) failing to schedule lunches with the top-prescribing physicians; (9) failing to utilize allotted educational funds; and (10) failing to meet Exelon "carve-out" requirements. Defendant alleges that while each of these deficiencies falls under the competency of territory management, plaintiff also had problems in the areas of "results focus," specifically, her Exelon and Elidel market share numbers dipped below the regional average.

Defendant alleges that its articulated legitimate, non-discriminatory reason for plaintiff's termination is not pretextual. Defendant contends that any evidence that plaintiff might submit to demonstrate that its decision to terminate her was dishonest falls far short of creating a triable

4

issue of fact on the question of pretext.

Defendant contends that plaintiff's disability discrimination claims must be dismissed for the alternative reason that plaintiff is not disabled.  Defendant argues that plaintiff's vertigo, mononucleosis, Achilles tendon injury, and carpal tunnel syndrome were temporary conditions and therefore cannot serve as the basis for plaintiff's disability claim.  Defendant further avers that plaintiff's diabetic status is not per se sufficient to qualify as a disability under the ADA, and plaintiff is not substantially limited in any major life activity.  Defendant further notes that on her initial claim for unemployment insurance benefits filed in 2003, plaintiff indicated both that there were no limitations on her ability to work and that she was not disabled.  Defendant states that "disability" was defined on the unemployment insurance benefits form exactly as it is defined for purposes of the ADA, i.e., as a "physical or mental impairment which substantially limits one or more major life activities; . . . a record of such impairment; or . . . regarding as having such an impairment."  Defendant argues that plaintiff cannot be disabled for purposes of this lawsuit but not disabled for purposes of collecting unemployment.

Defendant contends that plaintiff's FMLA retaliation claim must be dismissed for the alternative reason that plaintiff cannot establish a causal connection between her exercise of a protected right and any adverse employment action.  Defendant states that plaintiff returned from her last medical leave in January 2002 and the most recent adverse employment action following her return occurred over ten months later in October of 2002 when plaintiff was placed on the PIP, so that there is no temporal proximity.  Defendant asserts that there is no other evidence that defendant retaliated against plaintiff for taking leave under the FMLA.

Finally, defendant alleges that plaintiff's public policy claim must be dismissed because she cannot satisfy the causation and jeopardy elements. Defendant alleges that plaintiff has an adequate statutory remedy for each of her claims, and a public policy claim cannot be based on the FMLA.

In response, plaintiff asserts that she can establish a prima facie case of retaliation because she has provided sufficient evidence of several adverse actions. Plaintiff claims that within weeks of returning from her FMLA-protected medical leave, McCormick began treating her differently than other sales representatives while taking every opportunity to make plaintiff's job unpleasant by being critical all the time. Plaintiff alleges that McCormick subjected her to closer scrutiny; continuously increased her paperwork expectations following plaintiff's leaves; actively undermined plaintiff before and after ride-alongs by being too critical in the ride-alongs; failed to factor part-time hours into averages of plaintiff's calls per day and often compared plaintiff to national and regional standards inconsistently; demanded more of plaintiff, including requiring her to make more calls than other sales representatives, who were not required to call on their "Top 25" each week or to call on Exelon "carve-outs" once a week; and continually noted that plaintiff needed to make better use of her pre-call and post-call notes when other representatives did not use them. Plaintiff alleges that evidence that McCormick "treated Plaintiff differently along with the fact that this pattern of specific work assignments and disciplinary action designed to make her job more difficult began immediately after Plaintiff returned from her FMLA leave is sufficient to establish a *prima facie* case of retaliation."

Plaintiff also challenges defendant's articulated reason for her termination as providing an "incomplete if not false picture" of her performance history. Plaintiff alleges that although

6

McCormick had placed her on a Territory Coaching Plan for allegedly having sales below regional averages and for territory management concerns, plaintiff was "fully meeting expectations" in her overall 2001 performance review; she achieved her goals for 2002 and her targets for the last four months of 2002 after she had been placed on a second Territory Coaching Plan and a Performance Improvement Plan (PIP); plaintiff not only met expectations but showed a marked improvement since the PIP; and although defendant contends that plaintiff was not incorporating McCormick's suggestions into her work, McCormick's own notes show otherwise. Plaintiff points to other individuals who had the same alleged performance issues as her but were not placed on multiple territory trackers or a PIP, and she asserts that McCormick admits that she did not place every sales representative with sales below the regional averages on Territory Coaching Plans.

Plaintiff alleges that she has sufficient evidence to establish her age and gender discrimination claims because she was replaced by Alan Grablovic, a male whose date of birth is August 10, 1977; she has established the presumption that age and gender were determining factors in her "demotion" (an apparent mistake in plaintiff's brief); her sales immediately prior to her termination were better than those of other, younger sales representatives in her group; and her numbers for the third trimester improved dramatically after she had been placed on the PIP, thereby establishing an issue of fact with regard to pretext.  Plaintiff also notes that defendant hired 47 employees under the age of 40 between February 2002 and February 2004.

Plaintiff alleges that she can establish a case of disability discrimination because of the temporal proximity between defendant's notice of her diabetes and her termination and because defendant wrongly ascribed to plaintiff an inability to perform the functions of her job due to her

7

medical condition by treating similarly-situated, non-disabled representatives better than defendant treated plaintiff and subjecting plaintiff to close scrutiny.  Plaintiff alleges that although her Achilles tendon injury was temporary in nature, McCormick made statements implying that she believed plaintiff was limited in her ability to perform her job if her diabetes constantly affected her health.  Plaintiff cites statements that McCormick allegedly made to the effect of "How can we keep you well?" and "Sometimes you have to work when you're sick."  Plaintiff's depo., p. 246.

Finally, plaintiff does not address defendant's argument that she cannot base a public policy claim on the FMLA and that the jeopardy element is not satisfied for her remaining claims because she has an adequate statutory remedy for those claims.  Instead, plaintiff broadly asserts that the final two elements of her public policy claim are "essentially the same as the race discrimination claims under Title VII and O.R.C. § 4112," an apparent mistaken reference to another lawsuit, and she claims that the same evidence that supports her other claims supports her public policy claim.

In reply, defendant disputes that plaintiff was accomplishing her sales goals as set forth by her supervisor - "those goals being results in excess of the regional average" - but contends that the success claimed by plaintiff does not matter because she was not terminated solely for failing to meet her sales goals, but for the primary reason of her "chronic, severe, and well-documented shortcomings in the area of 'territory management,' including pre-call planning, calling on high-prescribing doctors, failing to record post-call notes, etc."  Defendant alleges that it is clear from the case law that an individual terminated for territory management deficiencies cannot rely on statistical sales success to show pretext.  Defendant alleges that plaintiff's argument that her

8

problems were no more severe than those of her fellow sales representatives misses the point
entirely because having chosen to proceed under the first method of proof for establishing pretext,
i.e., that the stated reason had no basis in fact, plaintiff must proffer evidence that the
determination that she failed to meet company expectations in the area of territory management
was factually false, which plaintiff cannot do.

Defendant interprets plaintiff's disability discrimination claim as a claim that it regarded
her to be disabled in the major life activity of working. Defendant alleges that plaintiff has
proffered no evidence that it regarded her as unable to perform a broad class of jobs. Defendant
also contends that plaintiff's "evidence" that defendant treated her differently because of her
FMLA leave in fact consists almost entirely of plaintiff's own self-serving, conclusory testimony
regarding McCormick's attitude toward her and perception of her.

### IV. Facts

The facts set forth in this section of the Court's Order are undisputed, unless otherwise
noted.

1.    Plaintiff was born in 1953.

2.    Defendant markets and sells prescription medication across the United States with a team-
      selling approach that relies on two divisions of sales representatives, Geigy and Sandoz,
      and between 4,000 and 6,000 representatives who serve eight different regions across the
      country.

3.    Plaintiff started working with defendant as a pharmaceutical sales representative in 1989
      and held several titles in sales with defendant for over 13 years.

4.    Most recently, plaintiff was a senior sales consultant whose job was to sell prescription medication to physicians in the Cincinnati/Northern Kentucky tri-state area.  Plaintiff's direct supervisor was her District Manager, Janeen McCormick.  McCormick became a district manager in April of 2001.  Her job responsibilities included supervising sales representatives and hiring new representatives.

5.    Sales representatives are assessed in several reports, including the quantity, target, and quality reports, and in mid-year and year-end performance assessments, among other devices.

6.    Plaintiff's daily duties included building relationships with physicians and training and educating the medical community.

7.    Plaintiff was historically a good performer and was promoted several times.

8.    Plaintiff met the expectations of her former District Managers, including McCormick's immediate predecessor, David Gill.  She was rated as fully meeting expectations in her 2001 performance review.

9.    On August 1 and 2, 2001, McCormick rode along with plaintiff as she made her sales calls. The parties dispute whether a Field Contact Report generated by McCormick indicated that plaintiff failed to accomplish all three of her objectives during these "ride alongs."

10.   The parties also dispute whether McCormick noted in plaintiff's 2001 performance review that plaintiff exhibited several shortcomings relating to call quality and frequency.

11.   Plaintiff took medical leaves of absence protected by the FMLA.

12. In April 2002, plaintiff was placed on a Territory Coaching Plan, which is a formalized report used by defendant to provide feedback to a representative to help the individual improve performance. Defendant contends that it placed plaintiff on the Plan as a result of the deficiencies it had noted, which plaintiff disputes. Plaintiff contends that at this time, her total sales were well above regional averages and she was still meeting expectations, which defendant denies.

13. The Plan prepared for plaintiff outlined two main areas of concern: (1) sales below the regional averages for some products, and (2) problems relating to territory management, i.e., how a representative conducts the responsibilities of selling to physicians in the geographical region to which she is assigned. Specifically, defendant noted that plaintiff's territorial management problems included her failure to plan lunches with top prescribers and her practice of infrequently calling upon top prescribers.

14. The Plan also set forth six expectations for plaintiff and emphasized the importance of meeting these expectations in light of defendant's launch of the new drug Elidel.

15. On May 21, 2002, McCormick sent an e-mail to plaintiff indicating that her call volume to her most important customers was too low and that she had not scheduled enough lunches with physicians.

16. In her mid-year performance review, plaintiff was rated "below expectations" for seven of the ten competencies considered by defendant when reviewing a sales representative's performance. The concerns reflected in the mid-year review again included not reaching enough physicians and failing to call top-prescribing physicians.

11

17.   In July 2002, McCormick again rode along with plaintiff to observe her on sales calls. Defendant alleges that McCormick again identified several areas of concern regarding plaintiff's performance, but plaintiff denies this.

18.   In August 2002, plaintiff was placed on a second Territory Coaching Plan.

19.   In August 2002, McCormick conducted another ride along with plaintiff.  Defendant claims, and plaintiff denies, that McCormick identified serious problems with regard to plaintiff's pre-call planning and post-call notes.

20.   Plaintiff was subsequently placed on a Performance Improvement Plan (PIP).  The PIP indicated that if plaintiff failed to improve, then defendant would have no alternative but to take further disciplinary action up to and including termination.  Defendant claims that it placed plaintiff on the PIP because she had failed to improve despite the two Territory Coaching Plans.  Plaintiff disputes this and claims that she was placed on the PIP despite meeting the call-per-day average expectation of 9 or 10, using the territory trackers at McCormick's suggestion, improving "fluidness and knowledge," and visiting all of her Tier 1 targets/physicians, 94% of her Tier 2 targets/physicians, and 76% of her Tier 3 targets/physicians.

21.    On November 5, 2002, McCormick e-mailed plaintiff expressing displeasure over what defendant cites as the poor quality of plaintiff's tracker, a sales tool.  Plaintiff concedes that McCormick e-mailed her and expressed displeasure but denies that it was over the poor quality of the tracker.

22.     On November 20 and 21, 2002, McCormick again rode along with plaintiff.  Defendant alleges that over the course of these two days, McCormick observed that plaintiff's problems dealing with territory management still had not improved and that, in fact, the situation had gotten worse.   Plaintiff disputes McCormick's alleged observations.

23.     On December 2, 2002, McCormick sent plaintiff a memorandum entitled "Reiteration of Job Expectations."  The memorandum noted three assignments that had been late since the implementation of the PIP.  On December 4, 2002, McCormick sent plaintiff an e-mail which defendant states was for the purpose of enabling plaintiff to prepare for another ride-along the following week and to know what was expected of her at this ride along.  Plaintiff disputes that this was the purpose of the e-mail.

24.     On December 11 and 12, 2002, McCormick conducted the ride along.  Defendant alleges that McCormick observed the familiar problems concerning poor territory management skills, which plaintiff disputes.

25.     On January 29, 2003, McCormick wrote a memorandum which defendant alleges summarized plaintiff's "sub-par performance since being placed on the PIP in October 2002."  Plaintiff disputes this.  The parties agree that McCormick subsequently consulted her boss, Regional Director Kevin McKinnon, and Kristen Marks, Human Resources Manager, and after discussing the matter recommended plaintiff's termination.  McKinnon and Marks agreed with the recommendation.

26. Plaintiff was terminated on February 11, 2003.

27. Defendant disputes each of the following allegations that plaintiff makes: Plaintiff was required to meet unreasonable paperwork expectations, which were not required of McCormick's other subordinates; plaintiff's best efforts were actively undermined by McCormick in several ride alongs; McCormick was very critical of plaintiff, rarely spoke to plaintiff, and often just glared at plaintiff in the offices of physicians she was visiting; McCormick expected plaintiff to call on Tier 1, Tier 2, and Exelon carve-outs more than other sales representatives; and McCormicks's behavior during the ride alongs was detrimental to plaintiff's sales efforts.

28. A physician's office complained in writing about McCormick's unprofessional behavior during a ride along with plaintiff.

29. McCormick did not place any other sales representatives on a PIP, although plaintiff alleges that the problems McCormick identified with plaintiff's performance were similar to the performance deficiencies McCormick had noted with other sales representatives who were not placed on a Territory Coaching Plan or on a PIP. Defendant denies this allegation.

14

30.     Defendant disputes each of the following allegations: McCormick originally expected

        plaintiff to make 15 calls per day, approximately 150% of what she expected other

        representatives to make; McCormick eventually compromised with plaintiff but still

        expected her to make between 11 and 13 calls per day; McCormick made plaintiff create 4-

        week trackers but never communicated to plaintiff how to make them; McCormick

        required plaintiff to call on her "Top 25" physicians more often than she required other

        sales representatives to do so; McCormick knew that plaintiff suffered from diabetes; and

        McCormick asked plaintiff, "How can we keep you well?" and told her that "Sometimes

        you have to work when you're sick."

31.     Plaintiff alleges that she continued to meet expectations and improved dramatically, which

        defendant denies.

32.     Plaintiff achieved a total sales percentage of 168.8% after being placed on a Territory

        Coaching Plan in August of 2002, but she was still terminated in February 2003, just two

        months before she turned 50.

33.     Two months after plaintiff's termination, she was replaced by a younger male, Allan

        Grablovic.

## V. Summary judgment standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of

an action.  This Court may only grant summary judgment as a matter of law when the moving

party has identified, as its basis for the motion, an absence of any genuine issue of material fact.

***Celotex Corp. v. Catrett***, 477 U.S. 317, 327 (1986).

15

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Id.* at 249 (citing *Cities Serv.*,  391 U.S. at 288-289.  If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted.  *Anderson*, 477 U.S. at 249.

## VI. Request for Oral Argument

The legal and factual issues involved in this case are not complex and they have been fully briefed by the parties. Pursuant to Rule 7.1 of the Local Rules of the United States District Court for the Southern District of Ohio, the Court therefore finds that oral argument is not necessary and plaintiff's request for same is denied.

## VII. Applicable law

### A. Age and gender discrimination

Under the law of this Circuit, the same evidentiary  framework applies to discrimination claims brought under Title VII, the ADEA, and state law. *Allen v. Ethicon, Inc.,* 919 F. Supp. 1093, 1098 (S.D. Ohio 1996) (Weber, J.) (citing *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582

(6th Cir. 1992). A plaintiff claiming age discrimination under these statutes may establish a prima facie case by introducing either direct or circumstantial evidence that the defendant discharged the plaintiff because of her age. ***Manzer v. Diamond Shamrock Chemicals Co.,*** 29 F.3d 1078, 1081 (6th Cir. 1994). Plaintiff may establish a prima facie case of age discrimination through circumstantial evidence by showing that: 1) she is a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position lost or not gained; and 4) her position was filled by someone outside of the protected class. ***Manzer,*** 29 F.3d at 1081 (citing ***McDonnell Douglas Corp v. Green,*** 411 U.S. 792, 802 (1973); ***Gagne v. Northwestern National Insurance Co.,*** 881 F.2d 309, 313 (6th Cir. 1989)).

Where age discrimination is alleged, plaintiff can establish the fourth prong of her prima facie case by showing that she was replaced by a substantially younger individual, even if that individual is within the protected class. ***O'Connor v. Consolidated Coin Caterers Corporation,*** 517 U.S. 308, 313 (1996); see also ***Manzer,*** 29 F.3d at 1081 n. 2; ***Coryell v. Bank One Trust Company N.A.,*** 101 Ohio St.3d 175, 180, 803 N.E.2d 781, 787 (2004). Plaintiff may also establish the fourth prong of a prima facie case by showing that she was treated less favorably than a similarly-situated employee outside of her protected class. ***Clayton v. Meijer, Inc.,*** 281 F.3d 605, 610 (6th Cir. 2002).  In such a case, plaintiff must prove that all relevant aspects of her employment situation were similar to those of the employee with whom she seeks to compare herself. ***Ercegovich v. Goodyear Tire & Rubber Co.,*** 154 F.3d 344, 352 (6th Cir. 1998).

The plaintiff's burden at the prima facie stage of the proceedings is not onerous, but "merely serves to raise a rebuttable presumption of discrimination by 'eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'" ***Cline v.***

*Catholic Diocese of Toledo*, 206 F.3d 651, 660 (2000) (citing *Hollins v. Atlantic Co.,* 188 F.3d

652, 659 (6th Cir. 1999) (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248,

253-54 (1981)).

The employer is entitled to summary judgment if the plaintiff does not establish a prima

facie case. If the plaintiff establishes a prima facie case, the employer can overcome the prima

facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment

action. *McDonnell Douglas,* 411 U.S. at 802. If the employer carries its burden, the plaintiff must

show that the reasons offered by the employer were not its true reasons, but were a pretext for

discrimination. *Id.* at 804.

The United States Court of Appeals for the Sixth Circuit has categorized different

evidentiary bases for three types of pretext showings: 1) defendant's reasons had no basis in fact;

2) the reasons did not actually motivate the discharge; or 3) the reasons were insufficient to

warrant a discharge. *Manzer v. Diamond Shamrock Chemicals Company,* 29 F.3d 1078, 1084 (6th

Cir. 1994). The first type of  showing consists of evidence that the reason offered for the plaintiff's

discharge never happened, i.e., that the reason is factually false. *Id.* The third showing ordinarily

consists of evidence that other employees, particularly those outside the protected class, were not

discharged even though they engaged in conduct substantially identical to that which purportedly

motivated the plaintiff's discharge. *Id.* If the plaintiff establishes the first or third showing, a

permissive inference of discrimination arises. *Id.* For the second showing, where the plaintiff

admits the factual basis underlying the employer's proffered explanation and further admits that

such conduct could motivate dismissal, plaintiff must introduce additional evidence of

discrimination because the reasons offered by the defendant are not directly challenged and

18

therefore do not bring about an inference of discrimination. *Id.*

Although the Court should refrain from probing an employer's business judgment, business judgment is not an absolute defense to unlawful discrimination. ***Wexler v. White's Furniture, Inc.***, 317 F.3d 564, 576 (6th Cir. 2003)(citing ***E.E.O.C. v. Yenkin-Majestic Paint Corp.***, 112 F.3d 831, 835 (6th Cir.1997)). The Court in ***Wexler*** addressed the extent to which a fact-finder may consider the reasonableness of an employer's decision:

> [T]he reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation. ***Smith v. Chrysler Corp.***, 155 F.3d 799, 807 (6th Cir.1998)) (holding that in evaluating a proffered nondiscriminatory basis for an employment action, courts should inquire into 'whether the employer made a *reasonably informed and considered decision* before taking an adverse employment action') (emphasis added); ***In re Lewis***, 845 F.2d 624, 633 (6th Cir.1988) ('Sears does not have to establish that the basis on which it acted in firing Lewis was *sound;* rather, Lewis has the burden of demonstrating that Sears' stated reasons are pretextual. One way for Lewis to do this is to show that Sears' asserted business judgment was so ridden with error that defendant could not honestly have relied upon it.') (emphasis in original) (internal quotation marks omitted).

*Id.*

### B. Disability discrimination

The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual."  42 U.S.C. § 12112(a).  A "qualified individual with a disability" means "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

19

O.R.C. § 4112.02 makes it an unlawful discriminatory practice "For any employer, because of the . . . disability . . . of any person, to . . . discharge without just cause . . . or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  The analysis of a claim under the ADA and under Ohio's disability discrimination statute is essentially the same.  ***Wohler v. Toledo Stamping & Mfg. Co.,*** 125 F.3d 856 (Table), 1997 WL 603422,  *2 (6th Cir. 1997).

In order to state a claim under the ADA, the plaintiff must demonstrate "(1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability."  ***McKay v. Toyota Motor Mfg., U.S.A., Inc.,*** 110 F.3d 369, 371 (6th Cir. 1997).

In determining whether an individual is disabled, an individualized inquiry must be made.  ***Cotter v. Ajilon Servs., Inc.,*** 287 F.3d 593, 598 (6th Cir. 2002) (citing ***Sutton v. United Air Lines, Inc.,*** 527 U.S. 471, 483, 119 S.Ct. 2139 (1999)). An individual is considered "disabled" under the ADA if she:

> (A) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) [has] a record of such an impairment; or
> (C) [is] regarded as having such an impairment.

42 U.S.C. § 12102(2).

20

The regulations accompanying the ADA define a "physical or mental impairment" as,

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

The term  "substantially limits" is defined to mean,

(i) Unable to perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

The regulations define "major life activities" as "functions such as caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

29 C.F.R. § 1630.2(i).  The regulations set forth the following factors to be considered in

determining whether an individual is  "substantially limited" in a major life activity:

(i) The nature and severity of the [claimant's] impairment;
(ii) The duration or expected duration of the impairment; and
(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

The Supreme Court has stated that the terms "substantially limits" and "major life

activity" must be "interpreted strictly to create a demanding standard for qualifying as disabled. .

." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681,

21

691 (2002). Any impairment that only moderately or intermittently prevents an individual from

performing major life activities is not a substantial limitation under the ADA. *Mahon v. Crowell,*

295 F.3d 585, 590-91 (6th Cir. 2002).

To establish that an impairment substantially limits the ability to engage in the major life

activity of working, the plaintiff must show that she is "significantly restricted in ability to perform

either a class of jobs or a broad range of jobs in various classes as compared to the average person

with comparable training, skills and abilities." *McKay,* 110 F.3d at 371 (quoting 29 C.F.R. §

1630.2(j)(3)(i)).  The "inability to perform a single, particular job does not constitute a substantial

limitation in the major life activity of working."  *Id.*

An individual may be regarded as disabled if "(1) a covered entity mistakenly believes that

[she] has a physical impairment that substantially limits one or more major life activities, or (2) a

covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one

or more major life activities." *Sutton,* 527 U.S. at 489, 119 S.Ct. at 2149-2150. Accordingly, "the

ADA protects those individuals 'regarded as having a disability if an employer ascribes to that

individual an inability to perform the functions of a job because of a medical condition when, in

fact, the individual is perfectly able to meet the job's duties.'" *Rodgers v. Norfolk Southern*

*Corp.,* 304 F.Supp.2d 961, 968 (S.D. Ohio 2003) (Sargus, J.) (citing *Ross v. Campbell Soup*

*Company,* 237 F.3d 701, 706 (6th Cir. 2001)).  In determining whether an employer regarded an

individual as being disabled, it is necessary to "look to the state of the mind of the employer."

*Ross,* 237 F.3d at 706. "[M]embership in the protected class becomes a question of intent," a

question which is "rarely susceptible to resolution at the summary judgment stage." *Id.*

22

The Sixth Circuit in *Ross* recognized the difficulty a plaintiff faces in proving that her employer regarded her as substantially limited in the major life activity of working:

> Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind. Thus, proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult. Yet the drafters of the ADA and its subsequent interpretive regulations clearly intended that plaintiffs who are mistakenly regarded as being unable to work have a cause of action under the statute. . . In cases such as this one, where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, combined with evidence that the employer concocted a pretextual justification for that firing, the need for more extensive factual inquiry into whether the employer engaged in unlawful discrimination is especially acute.

*Id.* at 709.

### C. FMLA

In order to establish a claim of retaliation under the FMLA, a plaintiff must show that  (1) she availed herself of a protected right under the FMLA, (2) she was adversely affected by an employment decision, and (3) a causal connection exists between the exercise of the FMLA right and the adverse employment action.  *Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 314 (6th Cir. 2001).

23

The Sixth Circuit summarized the adverse employment decision requirement in a recent

FMLA case as follows:

> Not every act affecting an individual's employment can be considered an adverse
> employment action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118
> S.Ct. 2257, 141 L.Ed.2d 633 (1998). A *de minimis* employment decision is not
> sufficient to support a Title VII claim. *White v. Burlington N. & Santa Fe Ry. Co.*,
> 364 F.3d 789, 795 (6th Cir. 2004) (en banc). Likewise, simply because an employee
> is made unhappy by an action does not mean that he has identified an adverse
> employment action. *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir.1999). Rather, an
> adverse employment action must work a 'materially adverse change in the terms
> and conditions of [plaintiff's] employment.' *Hollins v. Atl. Co.*, 188 F.3d 652, 662
> (6th Cir.1999). In contrast, 'reassignments without salary or work hour changes do
> not ordinarily constitute adverse employment decisions in employment
> discrimination claims.' *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th
> Cir.1996). Such reassignments may be considered adverse employment actions,
> however, if they function as a demotion, evidenced by 'a less distinguished title, a
> material loss of benefits, significantly diminished material responsibilities, or other
> indices that might be unique to a particular situation.' *Id.* at 886.

*McMillan v. Potter,* 130 Fed.Appx. 793, 797, 2005 Fed.App. 0376N (6th Cir. May 11, 2005).

### D. Public Policy Violation

In *Greeley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228, 551 N.E.2d

981 (1990), the Ohio Supreme Court recognized the tort of wrongful discharge in violation of

public policy. The tort requires four elements: (1) a clear public policy existed and was manifested

in a state or federal constitution, statute or administrative regulation, or in the common law (the

clarity element); (2) dismissing employees under circumstances like those involved in the

plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's

dismissal was motivated by conduct related to the public policy (the causation element); and (4)

the employer lacked overriding legitimate business justification for the dismissal (the overriding

justification element). *Collins v. Rizkana*, 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653, 657-58

24

(1995)(citing H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-99). The clarity and jeopardy elements are questions of law to be determined by the court, while the causation and overriding justification elements are questions of fact to be left to the jury. *Id.* at 70, 652 N.E.2d at 658.

Ohio does not recognize a public policy claim for termination in violation of the FMLA since the Act's statutory remedies adequately protect the public policy in favor of allowing a qualified individual to take medical leave necessitated by serious health needs. ***See Wiles v. Medina Auto Parts,*** 96 Ohio St.3d 240, 246, 773 N.E.2d 526, 533 (2002). As the Court explained in ***Wiles,*** "Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests." ***Id.*** at 244, 773 N.E.2d at 531. Similarly, in the case of ***Salyer v. Honda of America Mfg., Inc.,*** 2005 WL 2338786 * 9 (S.D. Ohio) (Holschuh, J.), the Court found that the jeopardy element was not satisfied as to plaintiff's public policy claims premised on employer intentional tort and unsafe workplace. The Court determined that the plaintiff had "not identified why the remedies available under an employer intentional tort claim are not adequate to protect the public policy underlying such a claim." ***Id.*** at *11. The Court noted that "Where a statute adequately protects society's interest as expressed in the statute, the public policy is not jeopardized by the absence of a recognized action for wrongful discharge." ***Id.*** at * 9 (citing ***Wiles,*** 96 Ohio St.3d at 244, 773 N.E.2d 526).

25

## VIII. Opinion

### A. Age and gender discrimination claims

Upon a careful review of the record, the Court finds that there are genuine issues of fact which preclude granting summary judgment in favor of defendant on plaintiff's age and gender discrimination claims.  Plaintiff has established a prima facie case of age and gender discrimination. She is a female, over age 40, who was terminated and replaced by a male outside of the protected age group.  Although defendant has offered legitimate, nondiscriminatory reasons for the actions it took with respect to plaintiff's employment, plaintiff has presented evidence that raises an issue as to whether the reasons offered by defendant are pretextual.   Specifically, there are disputed issues of fact as to whether plaintiff was performing at a level comparable to or higher than her male and/or younger counterparts and whether employees outside of the protected classes with performance problems similar to plaintiff's alleged performance issues were treated more favorably and were not terminated.  Accordingly, summary judgment on plaintiff's age and gender discrimination claims is not appropriate.

### B. Disability discrimination claim

There are genuine issues of material fact as to whether defendant regarded plaintiff as an individual with a disability on account of her diabetes and whether defendant took an adverse employment action against plaintiff because it perceived her to be disabled.  Accordingly, defendant is not entitled to summary judgment on plaintiff's disability discrimination claim.

## C. FMLA claim

Plaintiff has established the first two elements of her FMLA claim. First, she engaged in protected activity under the FMLA by taking a medical leave of absence for her Achilles tendon injury in October 2001, following which she remained on a part-time schedule through January 2002 due to the injury. Second, she was subjected to an adverse job action in that she was terminated in February of 2003 after being placed on a PIP in October of 2002. There are disputed questions of fact underlying resolution of the issue of whether there is a causal connection between plaintiff's protected activity and her termination so as to satisfy the third element of her FMLA claim. These factual issues are for the jury to resolve. Accordingly, defendant is not entitled to summary judgment on the FMLA claim.

## D. Public policy claim

It is clear that plaintiff cannot bring a public policy claim under Ohio law for a violation of the FMLA because she has adequate statutory remedies under the Act. *See Wiles,* 96 Ohio St.3d at 246, 773 N.E.2d at 533. In addition, plaintiff has not shown that the remedies available under the state and federal anti-discrimination statutes are inadequate to protect the public policy against discrimination in the workplace. Thus, the Court finds that the jeopardy element is not satisfied. Defendant is therefore entitled to summary judgment on plaintiff's public policy claim.

## IX. Conclusion

In accordance with the foregoing, defendant's motion for summary judgment is

**GRANTED** as to plaintiff's public policy claim and **DENIED** as to the remainder of plaintiff's

claims.  This case will proceed to trial pursuant to the schedule established by the Court.

**IT IS SO ORDERED.**


S/ Herman J. Weber
　　　　　　　　　　　　HERMAN J. WEBER
　　　　　SENIOR JUDGE, UNITED STATES DISTRICT COURT


J:\HJWA\04-061agegndrdisfmlaPUB.wpd